## BENNINGTON LUMBER CO. v. ATTAWAY *et al.*

No. 6818.   Opinion Filed ·June 13, 1916.

Rehearing Denied July 19, 1916.

(158 Pac. 566.)

FRAUDS. STATUTE OF—Sale—Actions—Evidence—Sufficiency—Contracts. Record examined and **held**: (1) That the evidence fairly tends to support the allegations of the petition to the effect that the defendants jointly and severally verbally promised to pay for the lumber furnished the contractor for the purpose of constructing their buildings. (2) That this contract was not affected by the second subdivision of the statute of frauds (section 941, Rev. Laws Okla. 1910) which provides: "The following contracts are invalid unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent: * * * Second. A special promise to answer for the debt, default or miscarriage of another, except in the cases provided for in the article on guaranty."

(Syllabus by the Court.)

*Error from District Court, Bryan County;*
*Jesse M. Hatchett, Judge.*

Action by the Bennington Lumber Company against H. W. Attaway and others. There was a judgment for

defendants, and plaintiff brings error. Reversed and re-manded.

*Kyle & Newman,* for plaintiff in error.

*V. B. Hayes, W. E. Utterback,* and *McPherren & Cochran,* for defendants in error.

KANE, C. J. This was an action on an account, com-menced by the plaintiff in error, plaintiff below, against the defendants in error, defendants below. Upon trial to a jury the court directed a verdict in favor of the de-fendants, upon which judgment was duly entered, to re-verse which this proceeding in error was commenced.

The facts over which there is no dispute may be stated briefly as follows: Attaway and Zauk were severally building a number of business houses in the town of Ben-nington, each employing under separate building contracts the same contractor, namely, the McFarland Construction Company. The lumber, the purchase price of which con-stitutes the subject of this action, was, up to a certain date, sold by the lumber company to the construction com-pany, to be used in the construction of these buildings. Some time during the progress of the work it developed that the contractor was insolvent and unable to pay for the material which had been previously furnished, or to pro-cure the material necessary to complete the buildings. Upon the discovery of this condition the plaintiff refused to advance to the McFarland Construction Company and those associated with it in the erection of said buildings any further credit to purchase materials to be used upon said buildings, whereupon the work came to a standstill. At this point, it is alleged, the owners of the buildings jointly and separately verbally promised and guaranteed to the plaintiff that if it would continue to furnish such material

as was necessary to build said buildings, they, and each of them, would pay the balance due the plaintiff, the Bennington Lumber Company, for the lumber already furnished, and that they, and each of them, would pay for such additional material as was ordered from plaintiff for the purpose of completing said buildings, etc. The grounds upon which the demurrer to the evidence offered to support this verbal promise by the owners was sustained, as stated by the trial court in an instruction to the jury, are as follows:

"This is a lawsuit by the Bennington Lumber Company against Mr. Attaway and Mr. Zauk for, I believe, seven hundred and some odd dollars, alleged to be due from them to the Bennington Lumber Company for material furnished by it that went into the buildings of the defendants, and that the defendants agreed to pay for the same. It seems that the lumber and material was sold to the McFarland Construction Company, they being the contractors who had the contracts for the erection of the four different buildings belonging to the two different defendants. The evidence discloses that Mr. Zauk owned one of the buildings and Mr. Attaway owned the other three, and that the material was sold to the McFarland Construction Company, not for any special building, but simply sold to them, and they used it promiscuously and indiscriminately on the four buildings. There is no evidence offered as to how much of the material sold went into Attaway's buildings and how much went into the Zauk building. The evidence further discloses that the defendants, if they promised to pay for the material, each promised to pay for such as went into his own building, and they did not both jointly agree to pay for what went into all the buildings combined. That would make it, if any liability at all, a separate liability against each one. There is no proof as to how much that liability against either one would be, and under the status of the case you would not be warranted in returning a verdict against both of the

defendants jointly; neither would you be warranted in returning a verdict against either one for any specific amount because there is no proof of it. Therefore the court holds and so instructs you that under that evidence or proof in the case, you would not be warranted in returning a verdict at all except for the defendants, and you are instructed that it is your duty to return a verdict for the defendants."

We cannot agree with the conclusions of the trial court as to the effect of the evidence offered for the purpose of establishing the joint and several obligation of the two owners. In our judgment, the evidence offered reasonably tends to show that upon it becoming apparent that the contractor was insolvent and could not pay for the material furnished, or to be furnished, or go on with the work, the two owners jointly agreed to assume the burden of paying the plaintiff for all the material used in the construction of their buildings, in order to enable the contractor to finish the work and to keep the buildings clear from the mechanic's or materialmen's liens to which they would have been subject if the lumber bills had been left unprovided for. It is true, in a sense, as the trial court says in the instruction just quoted, that it was the intention of the owners that each of them should pay for such material as went into his own building, but the following evidence, to our minds, discloses the arrangement between themselves whereby this purpose was to be accomplished:

"Q. I will get you to state to the jury whether or not this account as shown on your ledger there, to the Mc-Farland Construction Company, and the material that went into these buildings, is correct? A. It is. Q. Did you ever go over that account in your office with Mr. Zauk? A. Didn't go over it item for item, nothing more than just showing him the books; what was owing on the books on the account; how much the McFarland Construc-

tion Company owed on this account. Q. Did you ever furnish Mr. Attaway a copy of the account? A. Yes, sir. Q. Now, about when was it that you furnished him a copy of that account with reference to the time the building was completed? A. Well, it was just a short time before the building was completed. Q. Did you send any more material up there after you furnished that? A. Yes, sir; we furnished a lot more material. Q. How much? A. Something like $200; probably not quite that much, but somewheres in the neighborhood of $200. I went down to the store after that when I would send anything up there; after that I would go to the store and get his statement, and add this stuff to his statement. I think probably the last two or three items wasn't put on his statement. Q. Attaway's statement? A. Yes, sir. Q. I will get you to state if you had a conversation with Mr. Attaway and Mr. Zauk after these buildings were under construction? A. I did. Q. About the payment for the material that had been furnished and had gone into the buildings? A. Yes, sir. Q. Now, about when was that? A. Well, to the best of my recollection, I think that was along about the 15th of March, maybe; somewheres right along about that time. Q. What conversation did you have with them with reference to the account that was then due you by McFarland Construction Company, about paying it? A. Well, to explain it to you the best I can, Mr. Zauk came over from Sherman and came to my office and asked about the account, and I opened the books and shows him what the account was, and Mr. Attaway's store was just across the street in front of my office, and we went over to the store, and he and Mr. Attaway and myself got back there together, and was figuring up how much there was coming to McFarland, and Mr. Attaway showed how much the books showed, and I went to the office and got an account of the balance due us on the books on a piece of paper and brought to him, and he said at the time there wasn't going to be money enough to complete the job. The best of my recollection there was about $1,300 due the construction company on their contract price, and I think

our bill was something about $1,100 at that time, and I asked him about this bill—I asked about this bill. He says, 'We will have to take care of the bills;' says, 'We will have it to pay; we ain't going to have money enough to finish the building but we will have to pay it.' Mr. Zauk says, 'It looks like they are doing good work, and I wouldn't see a man lose money on the building if they are doing me good work.' Mr. Attaway said, 'I wouldn't either.' They asked me to make out an itemized statement of the account from start to finish and show each and every kind of material on separate bills, that they might have those bills when the buildings were completed, so that they might settle between themselves; how much each one would owe over-plus on their contracts. We went to work and made these bills, and I think there was several different bills of the different kinds of material made out and turned over to Mr. Attaway. Q. What, if anything, was said at that time about pay for material that was to be furnished that went into the building? A. Mr. Attaway said whatever they got from then on, to also put that on these bills and let them know what it was; that's the reason I would go to the store and get his statement; when they got anything else I would go to the store and get his statement and add it to it and tell him what they were getting. Q. Was Mr. Zauk present at that time? A. He was present at the time this conversation taken place. Q. Which conversation; the conversation about the material that was to be furnished thereafter? A. Yes; and about making out these bills. * * * Q. What else was said at that time? A. Well, they says, 'We will have to take care of you; we will have to pay your bills.' Said they would have to pay the bills in order to keep their buildings clear. Q. And then Attaway made the statement, 'Whatever they get [the McFarland Construction Company] from this on, place on the statement also, and let us know how much it is so we can figure out what is due on each building—that was the way the conversation was? A. Yes, sir; said they wanted to have one of these statements so they might have a settlement between themselves when

they got through, and wanted this put on separate bills; each separate kind of material, because Mr. Zauk used some Mr. Attaway didn't, and Mr. Attaway used some Mr. Zauk didn't, and they wanted separate bills of the material so they could figure out between themselves and see what each one owed."

This evidence, and more to the same effect, makes it entirely clear to us that whilst neither owner intended to pay for any of the material going into the building of the other, they jointly promised to pay the lumber company for it all, requiring separate statements from the lumber company, "so they might have a settlement between themselves when they got through." Entertaining this view of the evidence, it follows that the plaintiff was only concerned in the aggregate amount of the bill, and it was error to exclude evidence offered for the purpose of establishing that fact.

It is further contended on behalf of the defendants in error that such a contract is required to be in writing by the second subdivision of section 941, Rev. Laws 1910, which provides:

"The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent: * * * Second. A special promise to answer for the debt, default or miscarriage of another, except in the cases provided for in the article on guaranty."

This position is not tenable. The following general principle is approved by Mr. Browne in his work on the Statute of Frauds as being fairly deducible from the adjudicated cases: If the consideration for the new promise spring out of any new transaction, or move to the party promising upon some fresh and substantive ground

of a personal concern to himself, the statute of frauds does not attach. Browne on the Statute of Frauds, sec. 212. After discussing at some length the same question, the learned author in the same section continues:

"The words of the statute itself in their simple meaning seem to give us the true rule. It contemplates a promise to answer for another's debt, a promise for that purpose, a mere guaranty; and it never was meant that a man should set it up as a pretext to escape from the performance of a valid verbal obligation of his own, because, in performing it, the discharge of a third party's debt was incidentally involved."

It seems quite clear to us that the contract involved herein is governed by the foregoing general rule.

For the reasons stated, the judgment of the court below is reversed and the cause remanded with directions to grant a new trial.

All the Justices concur.